**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (SBN 295032)
Brittany S. Scott (SBN 327132)
28 Geary Street, Ste. 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com
         brittany@skclassactions.com

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN 249203)
Pamela Prescott (SBN 328243)
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Phone: 949-612-9999
E-Mail: ak@kazlg.com
       pamela@kazlg.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSUE HERNANDEZ, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br>   v.<br><br>WM WHOLESALE, LLC, a Delaware limited liability company,<br><br>and<br><br>AK FUTURES, LLC, a Delaware limited liability company,<br><br>                 Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

COMPLAINT – JURY TRIAL DEMANDED

## **NATURE OF THE ACTION**

1.      This class action aims to hold Defendants WM Wholesale, LLC and AK FUTURES, LLC (collectively, "Cake") responsible for masquerading marijuana as its exact opposite in the marketplace: purportedly lawful delta-8 and delta-10 vape products derived from hemp.

2.      Consumers purchase Cake's vape products believing they are perfectly legal and safe to use, and instead receive products criminally outlawed in many states throughout the country (and federally). Cake's products can cause consumers to be terminated from employment for a failed drug test at work, or serve prison time for driving under the influence, possession, or use. Cake's conduct is worse than, *e.g.*, selling purportedly non-alcoholic beer that is in fact alcoholic. Mere possession of the products Cake sells is a crime.

3.      Marijuana, also known as cannabis, is a federally controlled Schedule I drug. The primary psychoactive component in marijuana is delta-9 tetrahydrocannabinol ("THC"); delta-9 THC is responsible for the "high" users experience after consuming marijuana.

4.      Delta-8 and delta-10 THC, on the other hand, produces much milder and less intense effects, coupled with a lower likelihood of anxiety or paranoia as compared to delta-9 THC.

5.      Importantly, unlike delta-9 THC, delta-8 and delta-10 THC products are legal to sell, purchase, and possess in most jurisdictions so long as they are (a) derived from hemp[1] and (b) have a delta-9 THC concentration of no more than 0.3%.

6.      If a delta-8 or delta-10 product is derived from hemp but has a concentration of delta-9 THC greater than 0.3%, it is nonetheless automatically

---

[1] Pursuant to the 2014 and 2018 Farm Bills, the legal definition of "hemp" is any part of the plant *Cannabis sativa* with a concentration of delta-9 THC of no more than 0.3% on a dry weight basis.

COMPLAINT – JURY TRIAL DEMANDED

1

classified as marijuana under U.S. federal law, California law, and state law across the country. The 2018 Farm Act legalized hemp derivatives *only if* they contain a concentration of delta-9 THC less than 0.3%. Any cannabis products—including those marketed as delta-8 or delta-10—that exceed this threshold are marijuana and subject to all federal and state laws and regulations governing marijuana, not hemp.

7.     When manufacturers misrepresent delta-9 THC content in their vape products, consumers face serious risks to their health, safety, and livelihood. A survey conducted by Plaintiff's expert, Dr. Michael Dennis, demonstrates the legality of purported delta-8 and delta-10 products is an overwhelmingly material factor in consumers' purchasing decisions. Per Dr. Dennis' report, 91.5% of respondents reported that they consider the legality of the products at issue to be important.

8.     Further, consumers who choose these products for their advertised low delta-9 THC content (and due to the omission that the products are in fact marijuana) may unexpectedly experience stronger psychoactive effects than intended, which can lead to anxiety, panic attacks, impaired coordination, and dangerous situations like driving while unknowingly intoxicated. This misrepresentation and omission is particularly harmful for individuals who need to maintain sobriety for employment or medical reasons.

9.     The deceptive labeling can also have devastating personal consequences for consumers who rely on the accuracy of THC content for drug testing compliance. Individuals may fail workplace or legal drug screenings due to consuming higher levels of delta-9 THC than disclosed, potentially resulting in job loss, revocation of professional licenses, loss of custody rights, or violations of probation or parole requirements. This is particularly true in states where delta-9 THC from cannabis remains illegal both federally and at the state level. The

COMPLAINT – JURY TRIAL DEMANDED

manufacturer's dishonesty thus threatens not just consumers' immediate physical safety, but their economic security and personal freedom as well.

10.     This case involves Cake's widespread, deceptive representations that its delta-8 and delta-10 vape products contain less than 0.3% delta-9 THC and omission of the fact that the products are marijuana. On Cake's website, www.cakebrand.com, where consumers can purchase Cake's products, a footer states: "Products on this website contain 0.3% THC or less." The label of *every single* Cake product ever made or sold likewise contains representations such as: "CONTAINS: Hemp derived Δ 8THC and <.3% Δ 9THC"; and "This product is in compliance with section 10113 of the 2018 Farm Bill and contains <.3% Δ 9THC." No label of the Products discloses that they are marijuana.

11.     However, these representations are false. Cake's vape products in fact contain delta-9 THC in concentrations significantly more than 0.3%. Plaintiff's expert, Dr. Shaun Opie, analyzed over 50 samples of Cake's delta-8 and delta-10 products purchased from multiple sources between June 2024 and May 2025. Dr. Opie verified product authenticity through intact tamper seals and QR code verification before testing at USDA-registered, ISO-accredited laboratories capable of differentiating between delta-9 THC and similar cannabinoids like THC-A. **Every product tested** exceeded the 0.3% legal limit, with one of the products the named Plaintiff purchased – "OG Kush" – testing at 8.54% total delta-9 THC, *28 times higher than the legal threshold*.

12.     In addition to these 51 samples, Dr. Opie analyzed Cake's own Certificates of Analysis ("COAs") and determined an additional 45 products he had not tested personally had a delta-9 THC/total THC percentage greater than 0.3%. In all, the laboratory results Dr. Opie analyzed were tested over a 3-year period (June 2023 – May 2025) by 5 different laboratories in 3 different states. Dr. Opie concluded the tests and COAs he conducted and reviewed "demonstrate that

COMPLAINT – JURY TRIAL DEMANDED

3

Cake Brand uniformly manufactures products that exceed 0.3% total THC" and "demonstrate a systemic failure of the internal Cake Brand quality management system to identify products with more than 0.3% delta-9 THC which should not be released for sale."

13.     Such consistent results selected randomly across different production lots, purchase locations, dates, and testing laboratories show that Cake uniformly manufactures and distributes products in violation of federal and state law.

14.     Further, Judge Selna held that Defendant's Products are illegal marijuana *as a matter of law* based on a smaller subset of *the exact same test results* Plaintiff's expert Dr. Opie opines on here. *AK Futures LLC v. TBH Supply LLC*, 2025 WL 1112659, at *2, 6-13 (C.D. Cal. Jan. 10, 2025). Products must "stay" within the applicable 0.3% delta-9 threshold (at retail) to be lawful. *Id*. at *12-13. None of Defendants' Products are at or below the 0.3% delta-9 threshold at retail.

15.     Accordingly, Cake's vape products are marijuana under federal and state law, and not lawful hemp derivative products. *See AK Futures v. Boyd St. Distro, LLC*, 35 F.4th 682, 690-91 (9th Cir. 2022) ("[T]he only statutory metric for distinguishing controlled marijuana from legal hemp is the delta-9 THC concentration level."). In other words, Cake's vape products are Schedule I controlled substances.

16.     By deceiving consumers about the content of its products, Cake is able to take away market share from competing compliant products and increase its own sales and profits. Consumers lack the ability to test or independently ascertain the true delta-9 THC content at the point of sale. Reasonable consumers must and do rely on Cake and its competitors to honestly report the nature of their products and their ingredients. The label representations that the products contain less than 0.3% delta-9 THC communicate to reasonable consumers that the

product is specifically formulated to comply with federal and state law and minimize the risk of unexpected psychoactive effects, anxiety, panic attacks, impaired coordination, and failed drug tests. The fact that the products contain greater than 0.3% delta-9 THC directly contradicts this claim.

17.    Plaintiff brings this action individually and on behalf of similarly situated consumers who purchased Cake's delta-8 and delta-10 products that were falsely and misleadingly labeled as having less than 0.3% delta-9 THC and which omitted the fact that the products are marijuana. Plaintiff seeks to represent putative nationwide classes, multi-state subclasses, and Florida subclasses seeking damages, interest thereon, reasonable attorney fees and costs, restitution, equitable relief, and disgorgement of all benefits Cake has enjoyed from its unlawful and deceptive business practices, as detailed herein. In addition, Plaintiff seeks injunctive relief to stop Cake's unlawful conduct in the labeling and marketing of the products. Plaintiff makes these allegations based on his personal knowledge as to himself and his own acts and observations and, otherwise, based on investigation of counsel and developments in prior litigation.

## **PARTIES**

18.    Defendant AK FUTURES, LLC ("AKF") is a Delaware limited liability company with its principal place of business at 1007 West Grove Avenue, Suite B, Orange, California 92865. AKF, together with its affiliate entities,[2] such as WM WHOLESALE LLC ("WM"), produce and distribute Cake Brand delta-8 products. AKF is the owner and rights-holder to the Cake marks and related intellectual property. AKF's current individual members, James Clelland and Jaidee Capital LLC, are all domiciled in Santa Ana, California, and the members direct, control, and coordinate the company's activities from California. Jaidee

---

[2] Other affiliated entities include JMAR Holding LLC, Exotics Enterprises, Inc., JMJD Leasing Co., Inc., CMJ New Holdings, Inc., Jaidee New Holdings, Inc., CMJBIZ Management, Inc., and Jaidee Management, Inc.

COMPLAINT – JURY TRIAL DEMANDED

Capital LLC has a principal place of business at 15 Macarthur Place, Unit 2406, Santa Ana, CA 92707. The individual members of Jaidee Capital LLC are Jeffrey Meng, who is domiciled in Irvine, California, and the Estate of Devon Davis, who was also domiciled in California.

19.     Defendant WM is a Delaware limited liability company with its principal place of business at 1007 West Grove Street, Orange, California. WM WHOLESALE LLC's individual members are the same as those of AK FUTURES, LLC (*i.e.*, James Clelland and Jaidee Capital LLC). AKF licenses the Cake trademark to WM, who in turn wholesales Cake's Products in the market.

20.     Collectively, Defendants design, manufacture, advertise, distribute, and sell a variety of delta-8 and delta-10 vape pens and cartridges under the in-house Cake brand, both online at www.cakebrand.com, in retail stores across the United States, and on a variety of resellers' websites, including the popular website www.delta8resellers.com.

21.     The products at issue in this case include all Cake brand delta-8 and delta-10 disposable devices and cartridges from the following categories regardless of flavor, size, or additional purported cannabinoids: Cake 510 Delta 8 disposable devices and cartridges; Cake Live Resin Delta 8 disposable devices and cartridges; Cake Delta 8 with THC-A Live Nectar Sauce disposable devices and cartridges; Cake Delta 8 with HXC and THC-P disposable devices and cartridges; Cake Delta 8 with THC-A and THC-B Cake Badder Melted Diamonds disposable devices and cartridges; Cake Delta 8 TKO disposable devices and cartridges; Cake Delta 8 Glow disposable devices and cartridges; Cake Delta 8 Cold Pack disposable devices and cartridges; Cake Delta 8 Moneyline disposable devices and cartridges; Cake Delta 8 Liquid Diamonds with THC-M, THC-A, and THC-P disposable devices and cartridges; Cake Delta Delta 10 disposable devices and cartridges with delta-8 THC; Cake Wavy disposable devices and cartridges with

COMPLAINT – JURY TRIAL DEMANDED

6

Delta 11, Ice Diamonds THC-A, HXC-R, and THC-P with delta-8 THC; Cake Delta 8 Sauce disposable devices and cartridges; and Cake Delta 8 "Classics" disposable devices and cartridges, (collectively, the "Products"). The Products are sold in 1.0 g, 2.0 g, 3.0 g, and 6.0 g disposable device and cartridge sizes, and possibly others. Cake is responsible for the labeling of the Products, and their formulation.[3]

22.    Plaintiff Josue Hernandez is domiciled in Florida. Plaintiff purchased Cake Brand delta-8 disposable devices and cartridges in 2023 and 2024 from the website www.delta8resellers.com and in person from smoke shops in Miami Beach, Florida. Products Plaintiff purchased include Cake brand Delta 8 2.0 g disposable 510 cartridge in the OG Kush flavor and Cake brand TKO 3.0 g disposable device with Delta 8 Liquid Diamonds, THC-M, THC-A, and THC-P in the Whipped Cream Wreck flavor.

23.    Plaintiff purchased the Products for personal use to help with stress relief and relaxing after work. Plaintiff also specifically chose the Products because he wished to avoid the inebriation caused by delta-9 THC in traditional cannabis products. Plaintiff resides in Florida where marijuana remains illegal to purchase, possess, and use. For this reason, among others, it was important to Plaintiff that the Products he purchased were lawful hemp derivatives and not marijuana.

24.    Plaintiff reviewed and relied on the Products' packaging (when buying at smoke shops) and online marketing materials (when buying online)

---

[3] Cake's delta-10 products are in fact almost identical to its delta-8 products with respect to formulation and composition; the delta-10 distinction is primarily a marketing ploy to differentiate what is in reality a delta-8 product. Cake's COAs for its delta-10 products show that the products are comprised of primarily delta-8 THC with very minimal delta-10 THC. For illustration, Cake's COA for its Silverback Sauce Delta 10 Live Resin Disposable 510 Cartridge shows the product's delta-8 THC concentration is 90.4% while its delta-10 THC concentration is only 0.079%. Accordingly, all references in this Complaint to Cake's delta-8 products incorporate all of Cake's delta-10 products as well.

before buying the Products, including the representations and claims that the Products contained less than 0.3% delta-9 THC and the omission of the fact that the Products are marijuana.

25.    If Plaintiff had known the Products were falsely labeled and in fact contained a higher level of delta-9 THC than the legal limit, Plaintiff would not have bought the Products.

26.    Plaintiff continues to purchase what he believes are legitimate and compliant hemp derivative vape products, although he does not currently purchase Cake products. He is still interested in purchasing Cake's products, but he wants Cake to fix its practices and sell hemp derivative vape products with accurate labeling. Because of Cake's past failure to do so, however, he cannot rely on Cake's word alone that it has fixed the problem, and will thus be unable to purchase Cake brand hemp derivative products. If the Court issued an order forbidding Cake from claiming the Products are lawful and compliant and have less than 0.3% delta-9 THC unless they actually contain less than 0.3% delta-9 THC, then Plaintiff could trust Cake's label representations and Cake's omissions would be cured, and Plaintiff would buy Cake's Products again in the immediate future.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Defendants.

28.    This Court has personal jurisdiction over Defendants because their principal place of business is in California, their shared current individual member is domiciled in California, the residence and principle place of business of their

COMPLAINT – JURY TRIAL DEMANDED

sole LLC member is California, and Defendants coordinate the companies'
activities from the same building in California. Further, Defendants' contacts with
the State of California are continuous and substantial, and Defendants otherwise
intentionally availed themselves of the laws of this State through the marketing of
the Products at issue in California to consumers in California and through sales of
the Products in California to consumers in California, so as to render the exercise
of jurisdiction by this Court consistent with traditional notions of fair play and
substantial justice. All or nearly all of the Products' labels and product packaging
were designed and manufactured in California, and printed in Burbank, California.
A substantial portion of the events giving rise to the claims alleged here, including
the design, manufacture, and labeling of the Products, occurred in California.

29.    Venue is proper in this District under 28 U.S.C. § 1391 because a
substantial part of the events, omissions, and acts giving rise to the claims herein
occurred in this District and because Cake engages in continuous and systematic
business activities within this District. Moreover, Defendant WM has previously
taken the position that the Terms and Conditions governing Plaintiff's purchase of
Products on www.delta8resellers.com, and any other U.S. consumers' purchase of
Products on this website, are subject to California choice of law and forum
selection clauses that require disputes to be resolved before this Court.

## FACTUAL ALLEGATIONS

30.    **Why consumers choose delta-8 products.**

31.    Delta-8 THC vape products experienced a dramatic surge in
popularity following the 2018 Farm Bill's legalization of hemp-derived products.
What began as a niche market rapidly expanded into a multi-billion-dollar
industry, with vape pens and cartridges appearing in convenience stores, smoke
shops, and online retailers across the nation.

---

COMPLAINT – JURY TRIAL DEMANDED

32.    This dramatic market growth was driven by several factors. The legal gray area created by the Farm Bill allowed hemp-derived cannabinoids to be sold in states where traditional cannabis remained illegal. Alongside widespread availability, there was an increased consumer interest in alternatives to traditional cannabis for managing stress and anxiety.

33.    Delta-8 and delta-9 THC are similar but distinct chemical compounds found in cannabis plants. The key difference is in their molecular structure – delta-8 THC has a double bond on the 8th carbon chain, while delta-9 THC has this bond on the 9th carbon chain.

34.    All of these compounds can produce psychoactive effects by binding to cannabinoid receptors in the brain, but delta-8 typically produces milder effects compared to delta-9. Delta-9 THC is the primary psychoactive compound in what is commonly called marijuana and is more potent, often producing stronger euphoric effects and potentially more anxiety or paranoia in some users. Delta-8 is generally reported to produce a clearer-headed, less intense sensation with lower anxiety potential.

35.    From a legal standpoint, any cannabis plant or derivative product with a delta-9 THC concentration greater than 0.3% is marijuana and is classified as a federally controlled Schedule I drug and as marijuana under California and state law around the country. 21 U.S.C. §§ 841, 844, and § 812 Schedule I(c)(10), (c)(17). On the other hand, delta-8 products derived from hemp are legal to sell, purchase, and possess in many jurisdictions so long as the products contain less than 0.3% delta-9 THC. *See id.*; *see also* 7 U.S.C. § 1639*o*(1).

36.    Consumers typically choose delta-8 products for several key reasons. As a threshold, delta-8 and delta-10 vape products are a *legal alternative* to marijuana/cannabis. In areas where traditional cannabis remains illegal, consumers turn to delta-8 products because they can often purchase them legally through

---

COMPLAINT – JURY TRIAL DEMANDED

10

retail stores and online vendors due to their hemp-derived status and negligible delta-9 THC content. A survey conducted by Plaintiff's expert, Dr. Michael Dennis, demonstrates the legality of purported delta-8 and delta-10 products is an overwhelmingly material factor in consumers' purchasing decisions. Dr. Dennis' report states shows **91.5%** of respondents reported that they consider the legality of the tested products to be important. 83.4% of respondents reported that they consider the legality of the tested product to be at least moderately important (i.e., "moderately important," "very important," or "extremely important") in considering the product for purchase, and 40.2% considered "the legality of the tested product to be "extremely important."

37.    Further, many consumers seek these alternatives because they want milder psychoactive effects than traditional delta-9 THC provides. Consumers report delta-8 products offer a more subtle, clear-headed experience with less anxiety and paranoia, making them more suitable for daytime use or for people sensitive to traditional cannabis products.

38.    Users specifically choose these products seeking potential therapeutic benefits like anxiety relief, pain management, or help with sleep, but with less intense psychoactive effects than they might get from regular cannabis products. The perceived reduced risk of adverse effects like anxiety attacks or overwhelming intoxication makes these alternatives appealing to newer users or those who find traditional cannabis too potent.

39.    **The delta-8 vape product manufacturing process and market pressures.**

40.    Natural concentration of delta-8 THC in cannabis plants is very low. Accordingly, nearly all commercially available delta-8 THC is produced through a chemical conversion process.

COMPLAINT – JURY TRIAL DEMANDED

11

41.    This process typically begins by extracting CBD from federally legal hemp (*i.e.*, cannabis plants with a concentration of delta-9 THC of no more than 0.3% on a dry weigh basis). The CBD is then chemically converted into delta-8 THC using acids or other catalysts and heat. The end result of the process is called delta-8 distillate.

42.    Most delta-8 vape product manufacturers, like Cake, do not grow their own hemp, extract CBD, and make their own delta-8 distillate. The chemical conversion of CBD to delta-8 THC is a complex process requiring specialized knowledge, equipment, and safety controls. Manufacturers lack the facilities or expertise to safely perform this synthesis in-house. Instead, they purchase delta-8 distillate in bulk from specialized vendors or wholesalers and add flavors via compounds called terpenes to create the various products at issue in this case. Many companies like Cake also contract with third parties who manufacture white label versions of the vaping "juice" which is then co-packed into disposable cartridges and devices and inserted into product packaging of Cake's choosing on Cake's behalf.

43.    While delta-8 distillate contains a high percentage of delta-8 THC, the chemical process used to create it inevitably yields small amounts of other cannabinoids and reaction byproducts, including delta-9 THC. In other words, it is impossible to create delta-8 THC distillate without also creating delta-9 THC.

44.    High-quality delta-8 distillate requires multiple rounds of purification and rigorous testing to ensure that delta-9 THC content remains below the legal limit (*i.e.*, less than 0.3%). Thorough remediation and testing add significant cost and time to distillate production. Cheaper distillate may be less thoroughly purified, with incomplete removal of delta-9 THC and other byproducts, but is more attractive to cost-sensitive manufacturers.

45.     The regulatory environment for delta-8 is inconsistent and often poorly enforced, especially compared to the strict oversight of delta-9 THC products. This creates incentive for manufacturers to take risks with compliance, knowing that the chance of regulatory penalties is relatively low.

46.     As a result, some manufacturers are willing to purchase and use distillate that may not be fully compliant, banking on weak enforcement or the ability to "pass" with a single favorable lab report. The U.S. Drug Enforcement Agency ("DEA"), Food and Drug Administration ("FDA"), news articles, and consumer complaints clearly demonstrate a widespread problem with vape manufacturers underreporting delta-9 THC levels in their delta-8 products. *See, e.g.*, *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691 (9th Cir. 2022) ("According to the DEA and FDA, 'many cannabis-derived products do not contain the levels of cannabinoids that they claim to contain on their labels.'").

47.     The delta-8 THC market is highly competitive, with numerous brands vying for shelf space and consumer attention. This competition drives manufacturers like Cake to minimize production costs in order to offer lower prices or maximize profit margins. Purchasing bulk delta-8 distillate and/or finished "juice" (*i.e.*, distillate plus flavor terpenes and other potential additives) from vendors allows manufacturers like Cake to quickly scale up product lines and reduce overhead, but it also means they are often seeking the lowest possible price per gram. As explained above, this results in purchasing and incorporating delta-8 distillate and/or finished "juice" with unlawful levels of delta-9 THC.

48.     The Products at issue in this case vary in flavors and secondary cannabinoids, but the reality is that all of the Products are primarily (*e.g.*, 75-95%) comprised of the same bulk delta-8 distillate.

49.     The various flavors of each line of Products are the result of the addition of different terpenes. Terpenes provide flavor and aroma profiles, and can

COMPLAINT – JURY TRIAL DEMANDED

13

be derived from cannabis, botanically derived (*i.e.*, from non-cannabis plants), or synthetically created. Like base distillates, most delta-8 brands purchase terpene blends from specialized suppliers who create profiles mimicking different cannabis strains.

50.    Terpenes typically account for only 2-7% of the product, and usually under 5%. In other words, regardless of which terpenes a manufacturer or white labeler might add to the base distillate, the delta-9 THC levels in an end product are driven by the base distillate used. For this reason, all flavors of a particular delta-8 product are going to either pass as a hemp derived delta-8 derivative or fail as marijuana based on whether the base distillate was sufficiently pure or impure.

51.    **The illusion of diversity in products, product lines, and marketing.**

52.    Due to demand for vape products, manufacturers like Cake employ every strategy to differentiate their disposables and cartridges and grab more market share. One strategy differentiates products through flavors (*i.e.*, terpenes), but most companies lack proprietary terpene blends and buy from the same few vendors, so companies need other ways to stand out.

53.    Many brands create "enhanced" formulations of delta-8 products by adding other trace cannabinoids, or sometimes simply creating marketing material and branding that showcases some of the byproducts that inevitably remain in the distillate as some purported desirable additional feature in the product.

54.    Some of these additional cannabinoids include delta-10 THC, hexahydrocannabinol ("HHC" or "HXC"), tetrahydrocannabiphorol ("THC-P"), tetrahydrocannabinol-monoacetic acid ("THC-M"), and tetrahydrocannabinol-O-acetate ("THC-O").

55.    These additional cannabinoids are sometimes present in trace quantities if at all and, therefore, do not meaningfully offset the total percentage of

COMPLAINT – JURY TRIAL DEMANDED

14

delta-9 THC in the delta-8 products. This is because (1) like delta-8 THC, the process of creating these additional cannabinoids also results in creation of delta-9 THC and other reaction byproducts; or, more often, (2) the additional cannabinoids in the product were already byproducts of the original CBD to delta-8 reaction when the distillate was being created, and are therefore already in the distillate and have no impact on the product's overall delta-9 THC level.

56.    As an example of how insignificant these secondary cannabinoids can be on the overall concentration of compounds in the products, according to Cake's own COAs, its Delta 10 Live Resin 2.0 g cartridge in the Silverback Sauce flavor is purportedly comprised of 90.4% delta-8 THC and only 0.079% delta-10 THC.

57.    Similarly, according to Cake's own materials, its Delta 8 Liquid Diamonds with THC-M, THC-A, and THC-P 2.0 g cartridge in the AK-48 flavor, a similar product to that which Plaintiff purchased but in another flavor (Whipped Cream Wreck), is purportedly comprised of 91.097% delta-8 THC, and less than 0.015% of THC-A, THC-P, or THC-M.

58.    Defendant WM has stated the Products were all made by combining only delta oil and terpenes.

59.    **THC-A's unique relationship to delta-9 THC.**

60.    THC-A is a precursor to delta-9 THC. In its raw form, THC-A does not produce a "high" because its molecular structure prevents it from binding effectively to cannabinoid receptors in the brain. The specific part of THC-A responsible for this is called a "carboxyl group."

61.    When cannabis or cannabis derivatives containing THC-A are heated—through smoking, vaping, or cooking—a process called decarboxylation occurs. This process removes the carboxyl group, converting THC-A into delta-9 THC. The temperatures necessary for this conversion are relatively low and readily achieved during typical smoking or vaping.

COMPLAINT – JURY TRIAL DEMANDED

15

62.    Because THC-A is converted to delta-9 THC when exposed to heat, it is essential to measure both compounds together when determining the total potential delta-9 THC content in vape products and other cannabis and hemp derivatives. Regulatory and laboratory testing often calculate "total THC" by adding the measured delta-9 THC to the amount of THC-A, adjusted for a conversion factor. The conversion factor is usually around 87% because approximately 87% of the THC-A present in a vape product will become delta-9 THC upon consumption via heat.

63.    Indeed, in a letter about the control status of THC-A, the DEA clarified THC-A is classified as a controlled Schedule I substance alongside delta-9 THC under the Controlled Substances Act ("CSA") for these very reasons. *See* Exhibit A. As it relates to the difference between hemp and marijuana, the DEA stated "when determining whether a substance constitutes hemp, the delta-9 THC concentration is to be tested 'using post-decarboxylation or other similarly reliable methods.'" *See id.*; *see also* 7 U.S.C. § 1639p(a)(2)(A)(ii); 7 U.S.C. § 1639q(a)(2)(B).

64.    As explained earlier, the decarboxylation process converts THC-A into delta-9 THC. And for purposes of enforcing the hemp definition in the 2018 Farm Bill, as well as the CSA, the DEA is clear that "the delta-9 THC level must account for any []THC-A in a substance." *Id.*

65.    **Cake's unlawful conduct and its impact on the putative class.**

66.    James Clelland co-founded Cake with Devon Davis and Jeffrey Meng. *See* Exhibit B. Cake launched its delta-8 vape products at the CHAMPS Trade Show in Orlando, Florida in October 2020. *Id.* Demand for Cake products was overwhelming. *Id.* Cake has achieved tremendous commercial success, positioning itself as the self-proclaimed "market leader in high-quality hemp-derived Delta-8 vaping products." Within months of launching, Cake generated

---

COMPLAINT – JURY TRIAL DEMANDED

over $1 million in weekly sales, with first-year revenue exceeding $60 million and 2022 revenue surpassing $110 million. The products were and continue to be sold nationwide in every state where hemp products are legal, both online and in countless retail establishments.

67.    As explained above, this case concerns the manufacture and marketing of Cake's Products, which contain greater than 0.3% delta-9 THC. When Cake misrepresents delta-9 THC content in the Products, consumers face serious risks to their health, safety, and livelihood. Users who choose these products specifically for their advertised low delta-9 THC content may unexpectedly experience stronger psychoactive effects than intended, which can lead to anxiety, panic attacks, impaired coordination, and dangerous situations like driving while unknowingly intoxicated. This misrepresentation is particularly harmful for individuals who need to maintain sobriety for employment or medical reasons.

68.    Cake's deceptive labeling can also have devastating personal consequences for consumers who rely on the accuracy of THC content for drug testing compliance. Individuals who purchase Cake's Products may fail workplace or legal drug screenings due to consuming higher levels of delta-9 THC than disclosed, potentially resulting in job loss, revocation of professional licenses, loss of custody rights, or violations of probation or parole requirements. This is particularly true in states where delta-9 THC from cannabis remains illegal both federally and at the state level. Cake's dishonesty thus threatens not just consumers' immediate physical safety, but their economic security and personal freedom as well.

69.    Cake designs, manufactures, advertises, distributes, and sells the Products both online at www.cakebrand.com, in retail stores across the United States, and on reseller websites.

COMPLAINT – JURY TRIAL DEMANDED

17

70.    Cake's own website, www.cakebrand.com, includes a footer that states: "Products on this website contain 0.3% THC or less." *See* Exhibit C.

71.    Cake omits from every one of the Products' front labels any disclosure or warning that the Products are not lawful hemp derivatives but are instead marijuana and a Schedule I drug.

72.    Cake includes the following misrepresentation on each of the Products' back labels: "This product is in compliance with section 10113 of the 2018 Farm Bill and contains <.03% Δ9THC."

73.    Cake also includes the following variations of the same uniform misrepresentation on the Products' back labels depending on whether the Products purportedly include cannabinoids other than delta-8 THC: (1) "CONTAINS: Hemp derived Δ 8THC and <.3% Δ 9THC."; (2) "CONTAINS: Hemp derived THC-M, Delta 8 THC, THC-A, THC-P, and <.3% Δ 9THC."; (3) "CONTAINS: Hemp derived Δ 8THC, CBD, CBN and <.3% Δ 9THC."; (4) "CONTAINS: Hemp derived Δ 10THC, Δ8THC, and <.3% Δ 9THC."; (5) "CONTAINS: Hemp derived THC-M, Delta 8THC, THC-A, THC-P, other cannabinoids and <.3% Δ 9THC."; (6) "CONTAINS: Hemp derived THC-A, other cannabinoids, and <.3% Δ 9THC."; (7) "CONTAINS: Hemp derived Δ 8THC, Hexahydrocannabinol, THC-P, CBD, CBN, and <.3% Δ 9THC."; (8) "CONTAINS: Hemp derived Δ 8THC, Hexahydrocannabinol, THC-P and <.3% Δ 9THC."; and (9) "CONTAINS: Hemp derived Δ 8THC, HHC, H4CBD, CBD, CBG, THC-A, THC-B and <.3% Δ 9THC." *See* Exhibit D.

74.    Despite the variations in these misrepresentations, for purposes of this action they all include the same "<.3% Δ 9THC" misrepresentation at the end.

75.    These label representations have remained consistent throughout the Products and throughout the class period alleged herein.

COMPLAINT – JURY TRIAL DEMANDED

76.     Indeed, federal and state laws require the Products to contain less than 0.3% delta-9 THC before Cake can lawfully manufacture and sell the Products in states like Florida, among others. Even without the direct representations on the Products' labels, consumers who are shopping for delta-8 products reasonably assume that a product being sold online that can be shipped to their state, or a product being sold in a local smoke shop or convenience store— and *not* at a marijuana dispensary—complies with federal and state laws and must contain less than 0.3% delta-9 THC.

77.     And yet, testing by an independent, accredited, and highly regarded laboratory retained by Plaintiff's counsel showed the Products contain greater than 0.3% delta-9 THC. Plaintiff's expert, Dr. Shaun Opie, analyzed over 50 samples of Cake's delta-8 and delta-10 products purchased from multiple sources between June 2024 and May 2025. Dr. Opie verified product authenticity through intact tamper seals and QR code verification before testing at USDA-registered, ISO-accredited laboratories capable of differentiating between delta-9 THC and similar cannabinoids like THC-A. **Every product tested** exceeded the 0.3% legal limit, with one of the products the named Plaintiff purchased – "OG Kush" – testing at 8.54% total delta-9 THC, *28 times higher than the legal threshold*. In addition to these 51 samples, Dr. Opie analyzed Cake's own COAs and determined an additional 45 products he had not tested personally had a delta-9 THC/total THC percentage greater than 0.3%. In all, the laboratory results Dr. Opie analyzed were tested over a 3-year period (June 2023 – May 2025) by 5 different laboratories in 3 different states. Dr. Opie concluded the tests and COAs he conducted and reviewed "demonstrate that Cake Brand uniformly manufactures products that exceed 0.3% total THC" and "demonstrate a systemic failure of the internal Cake Brand quality management system to identify products with more than 0.3% delta-9 THC which should not be released for sale." In other words, these consistent

results selected randomly across different production lots, purchase locations, dates, and testing laboratories show that Cake uniformly manufactures and distributes products in violation of federal and state law.

78.    Because the Products are marijuana and not hemp, the United States Department of Agriculture ("USDA") has no oversight over Cake's Products. Any USDA regulations are moot because the Products are a Schedule I controlled substance.

79.    Cake provides COAs for its products on its website and on the websites of resellers. Cake also provides QR codes on each package with links to what are supposed to be COAs for that specific product.

80.    However, in an effort to obfuscate and hide relevant evidence, Cake has recently deleted or otherwise made unavailable some of the COAs which are linked from its packaging QR codes.

81.    The COAs on Cake's website remain, however. Given the independent testing results above, the majority of Cake's COAs demonstrate they are either: (a) fraudulent; (b) the result of lab shopping for a lab with inaccurate testing protocols; (c) the result of lab shopping for a lab willing to provide fake results; (d) the result of Cake intentionally sending a compliant sample for testing while using the cheaper noncompliant bulk distillate for the product actually being releasing into the market; or (e) establish that the concentration of delta-9 THC in Cake's Products increases after it is manufactured and stored but before it is sold at retail.

82.    Notably, some of Cake's own COAs actually prove its products are and were marijuana and not hemp even during initial compliance testing after manufacture. For example, Cake's own COA for one of the Products Plaintiff purchased—the TKO 3.0 g disposable device with Delta 8 Liquid Diamonds, THC-M, THC-A, and THC-P in the Whipped Cream Wreck flavor—shows that

COMPLAINT – JURY TRIAL DEMANDED

the product had a THC-A concentration of 6.534%. This means once a consumer who purchased this specific product heated up the mixture and inhaled through the mouthpiece, the amount of delta-9 THC in the vapor was **2,178%** above the 0.3% threshold for hemp derivatives.

83.    This demonstrates Cake not only manufactured and sold marijuana disguised as hemp, but ***knew*** that it did so because of its own testing prior to sending the product out into the market.

84.    Meanwhile, the same COA for the product Plaintiff purchased purports to show the delta-9 THC level somewhere below 0.014 mg/g, or otherwise so little that it was undetectable. Independent laboratory testing by two different respected and accredited laboratories showed that this specific product had a delta-9 THC level of 0.953% - 1.41% (not including what the THC-A would have contributed).

85.    That means independent testing from two different laboratories showed one of the specific products Plaintiff purchased had ***at least*** 2,269% - 3,357% more delta-9 THC than the concentration Cake claims in its own COA for the product. The difference is much more if one includes the THC-A waiting to be converted upon use.

86.    In summary, Cake knew its Products were and are marijuana and not hemp. Cake's label representations are false and misleading. Contrary to Cake's material representations, the Products do not contain less than 0.3% delta-9 THC.

87.    With respect to the Products, Cake knew that one of the most important, material label representations to consumers is the statement that the Products are lawful hemp derivatives and contain less than 0.3% delta-9 THC. Cake made this prominent statement with knowledge that it is false and/or misleading to reasonable consumers. By deceiving consumers and regulators about

COMPLAINT – JURY TRIAL DEMANDED

the content of its Products, Cake takes away market share from competing products which are compliant, thereby increasing its own sales and profits.

88.     Consumers lack the ability to test or independently ascertain the specific compounds in a vape product and their concentrations at the point of sale. This is especially true when the QR codes on the products link to fraudulent or fake COAs, or to deleted COAs which provide no information, as in the case of Cake.

89.     Reasonable consumers must and do rely on Cake to honestly report the nature of the Products and their contents, and to comply with all federal and state laws when designing, manufacturing, distributing, and selling the Products.

90.     Cake intended for consumers to rely on its representations and omissions, and hundreds of thousands of consumers did in fact so rely. As a result of its false and misleading labeling and marketing, Cake was able to sell the Products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions. In fact, by Cake's own admission, as of February 2021 it was generating more than $1 million per week in sales of the Products.

91.     Cake's deceptive packaging and marketing at issue here was consistent during the last four years.

92.     Notably, the "less than 0.3% delta-9 THC" and "in compliance with section 10113 of the 2018 Farm Bill" representations are not disclaimed or modified anywhere on the Products' labels. No asterisk or marking appears by the representations that would suggest to a reasonable consumer that they need to look elsewhere on the label to understand the true meaning. There is no disclosure on the front label that the Products are in fact marijuana. Because the statements appear effectively as one of the main claims on the label of the Products, reasonable consumers interpret them at face value: that the Products literally

contain less than 0.3% delta-9 THC and are legal to purchase, possess, and use under federal law.

93.    Consumers' belief in the accuracy and truthfulness of the label representations regarding the Products' delta-9 THC content is further reinforced by the fact that Cake's Products are available online to purchase and ship to states where cannabis remains unlawful, and the fact that the Products are available on store shelves in those same states.

94.    Cake deceptively and misleadingly conceals other material facts about the Products, including: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are not legal to purchase, possess, or use under federal law, and many state laws; (d) that the Products are marijuana and not hemp; and (e) that the Products are a Schedule I drug due to the delta-9 THC content.

95.    To this day Cake continues to conceal and suppress the existence, identity, nature, and concentration of delta-9 THC in the Products.

96.    Similarly, to this day, Cake continues to conceal and suppress the fact that the Products are not legal to possess, purchase, or use under federal law and state law.

97.    Plaintiff contends that on occasion he would experience a heightened sense of inebriation and intoxication while using the Products.

98.    Plaintiff contends that had he known the Products contained an illegal amount of delta-9 THC greater than 0.3%, he would not have purchased the Products.

99.    Based on Cake's representations and marketing materials, Plaintiff and reasonable consumers would not expect that the Products would contain an illegal amount of delta-9 THC greater than 0.3%.

COMPLAINT – JURY TRIAL DEMANDED

100. Plaintiff purchased the Products to his detriment, as did members of the putative classes.

101. Plaintiff purchased the Products for personal use, including to lawfully manage stress.

102. The price paid by Plaintiff was representative of the price paid by similarly situated consumers who purchased the Products.

103. The representations and omissions on the Products purchased by Plaintiff were the same as the representations purchased by members of the putative classes.

104. Acting reasonably under the circumstances, Plaintiff relied on Cake's representations and omissions for the truth of the matter stated.

105. Cake intentionally represented that the Products contained less than 0.3% delta-9 THC on the Products' label in order to be permitted to sell the Products to consumers in the first place, and to induce purchases and increase sales of the Products.

106. Manufacturers are able to charge a price premium for legally compliant products that are labeled as compliant with federal law. Cake intentionally included the representations at issue on the Products' label and in marketing materials to increase sales and/or charge a premium for the Product.

107. Cake knew or should have known that reasonable consumers would consider the representations and omissions material in deciding to purchase the Products.

108. Cake knew or should have known that the representations and omissions could plausibly deceive reasonable consumers into believing that the Products contained less than 0.3% delta-9 THC and were lawful to purchase, possess, and use.

COMPLAINT – JURY TRIAL DEMANDED

24

109.    Reasonable consumers ascribe a common meaning to words on product labels.

110.    Reasonable consumers rely on product labels for their truth and accuracy.

111.    Reasonable consumers are not required to conduct independent research to determine the truth of label statements.

112.    Reasonable consumers are not expected to look beyond misleading representations on the label of a product or in marketing materials to determine whether they are false.

113.    Instead, it is the responsibility of product manufacturers to accurately label their products in a manner that is not misleading.

114.    Plaintiff and reasonable consumers reasonably believed that the statements and omissions on the Products' label were true regarding their content and legality.

115.    As described herein, Cake's representations are literally false.

116.    Accordingly, there is no "common sense" interpretation of the representations that would overcome their falsity.

117.    At the time Plaintiff and reasonable consumers purchased the Products, Plaintiff and consumers did not know, and had no reason to know, that the representations and omissions were misleading, deceptive, and unlawful. Plaintiff and consumers would not have purchased the Products if they had known the truth.

118.    As an immediate, direct, and proximate result of Cake's false, misleading, and deceptive representations and omissions, Cake injured Plaintiff and putative class members in that they: (a) paid a sum of money for a product that was not as represented; (b) paid a premium price for a product that was not as represented; (c) were deprived the benefit of the bargain because the Products they

purchased were different from what Cake warranted; (d) were deprived the benefit of the bargain because the Products had less value than what was represented; (e) did not receive a product that measured up to their expectations as created by Cake; (f) used a product that Plaintiff and the members of the classes did not expect or consent to; (g) used a product that was unlawful to purchase, possess, and use; (h) without their knowing consent, used a substance that is potentially harmful to their health or which could jeopardize their economic security and personal freedom; (i) without their knowing consent, used a substance containing an unlawful level of delta-9 THC.

119.   Accordingly, Plaintiff and class members have suffered injury in fact and lost money or property because of Cake's wrongful conduct.

120.   As the intended, direct, and proximate result of Cake's false, misleading, and deceptive representations and omissions, Cake has been unjustly enriched through more sales of falsely labeled product and higher profits at the expense of Plaintiff and class members. As a direct and proximate result of its deception, Cake also unfairly obtained other benefits, including the higher value associated with a legally compliant brand, redirecting sales to it and away from its competitors, and increased sales of its Product.

## **CLASS ALLEGATIONS**

121.   ***Class Definition***: Plaintiff brings this action on behalf all people in the following classes and subclasses (collectively referred to as "Class Members"):

(a).   Delta8Resellers Nationwide Class: All persons nationwide who, like Plaintiff, purchased Defendants' Products on www.delta8resellers.com for personal or household use since November 21, 2021 through the date of class notice.

(b).   Delta8Resellers Multi-State Subclass: All persons in states where marijuana is illegal to purchase and possess by the

COMPLAINT – JURY TRIAL DEMANDED

general public (*i.e.*, Alabama, Arkansas, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Nebraska, New Hampshire, North Carolina, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin, and Wyoming) who purchased Defendants' Products on www.delta8resellers.com for personal or household use since November 21, 2021 through the date of class notice.

(c). <u>Delta8Resellers Florida Subclass</u>: All persons in Florida who purchased Defendants' Products on www.delta8resellers.com for personal or household use since November 21, 2021 through the date of class notice.

(d). <u>Nationwide Consumer Protection Brick and Mortar Subclass</u>: All persons in the United States who purchased the Products for personal or household use at a brick and mortar location (*i.e.*, not online) since November 21, 2021 through the date of class notice.

(e). <u>Multi-state Consumer Protection Brick and Mortar Subclass</u>: All persons who purchased Defendants' Products at a brick and mortar location (*i.e.*, not online) for personal or household use (1) in the states of Michigan, Minnesota, or New Jersey within the applicable statute of limitations; (2) in the state of Missouri within the applicable statute of limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the applicable statute of limitations; or (4) in the states of Illinois and New York within the applicable statute of limitations.

(f). <u>Florida Consumer Protection Brick and Mortar Subclass</u>: All persons who purchased Defendants' Products in Florida at a

COMPLAINT – JURY TRIAL DEMANDED

27

brick and mortar location (*i.e.*, not online) for personal or household use since November 21, 2021 through the date of class notice.

122.    Subject to additional information obtained through further investigation and discovery, the foregoing class definitions may be expanded or narrowed by amendment or in the motion for class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

123.    Specifically excluded from the putative classes are Defendants WM and AKF and any entities in which either Defendant has a controlling interest, their agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

124.    ***Numerosity***. Class Members are so numerous that their individual joinder herein is impracticable. Each Class or Subclass includes hundreds of thousands of consumers. The precise number of Class Members and their identities are unknown to the Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of the entity operating www.delta8reselers.com, Cake, its agents, its distributors and retailers, or other means.

125.    ***Commonality and Predominance***. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

(a)    Whether Cake misrepresented and/or failed to disclose material facts concerning the Products;

(b)    Whether the omissions and representations on the Products' label

COMPLAINT – JURY TRIAL DEMANDED

28

and the Products' marketing materials, or any single omission or representation, is false, misleading, and/or deceptive;

(c)    Whether Cake's conduct in advertising and selling the Products amounted to unlawful, unfair, and/or deceptive business practices;

(d)    Whether Plaintiff and the Class Members are entitled to equitable and/or injunctive relief;

(e)    Whether Plaintiff and the Class Members have sustained damage as a result of Cake's unlawful conduct;

(f)    The proper measure of damages sustained by Plaintiff and the Class Members; and

(g)    Whether Cake was unjustly enriched by its unlawful practices.

126.    *Typicality*. The claims of the Plaintiff are typical of the claims of the Class Members in that Plaintiff and the Class Members sustained damages as a result of Cake's uniform wrongful conduct, as alleged above.

127.    *Adequacy*. Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the classes.  Plaintiff has no interests that are antagonistic to those of the Class Members. Plaintiff has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case that would create a conflict of interest with the proposed Class Members.

128.    *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for Class Members; the Class Members are readily definable; prosecution as a class action avoids repetitive litigation and duplicative litigation costs, conserves

judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

129.   Cake has acted or failed to act on grounds generally applicable to the Class Members, thereby making appropriate final injunctive relief with respect to the Class Members as a whole.

130.   Without a class action, Cake will continue a course of action that will result in further damages to the Plaintiff and Class Members and will likely retain the benefits of its wrongdoing.

131.   *Presuit notice*. On August 19, 2024 Plaintiff sent Defendants pre-suit notice in a letter that complied with all applicable notice requirements. On November 7, 2024, Plaintiff sent another pre-suit notice to Defendants' registered agent.

## COUNT I

### Violations of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

132.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

133.   Plaintiff brings this cause of action individually and on behalf of all proposed Classes.

134.   California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

135.   Cake acted with knowledge and intent.

136.   Plaintiff alleges a claim under all three prongs of the UCL.

137.   As alleged above, Cake engaged in fraudulent conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

138.   Cake's conduct also constitutes "unfair" business acts and practices

COMPLAINT – JURY TRIAL DEMANDED

within the meaning of the UCL, in that its conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Cake's violation of consumer protection and unfair competition laws resulted in harm to consumers.

139.   Plaintiff also alleges a violation under the "unlawful" prong of the UCL because Cake's conduct violated consumer protection laws and the common law as set forth herein.  Further, Plaintiff alleges a violation of the unlawful prong because it is unlawful to sell products containing more than 0.3% delta-9 at the federal level (including 21 U.S.C. § 801, *et seq*.), as well as within Florida and many other states.

140.   As a direct and proximate result of Cake's unfair and deceptive practices, Plaintiff and the other members of the classes have suffered and will continue to suffer out-of-pocket losses.

141.   Plaintiff and class members in the classes have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Cake alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and class members in the classes are inadequate because they are not equally prompt, certain, or efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money a defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as

restitution because claims under the UCL entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

142.   Equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products are determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff and members of the classes would be left without the parity in purchasing power to which they are entitled.

143.   Plaintiff seeks all relief available under the UCL.

## COUNT II

### Violations of California's Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code §§ 1750, *et seq.*

144.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

145.   Plaintiff brings this cause of action individually and on behalf of all the classes and subclasses.

146.   Defendant is a "person" as defined by California Civil Code § 1761(c).

147.   Plaintiff and the other members in the classes are "consumers" within the meaning of California Civil Code § 1761(d).

148.   For the reasons alleged above, Defendant violated California Civil Code § 1770(a)(5)(7) and (9).

149.   Plaintiff provided pre-suit notice of the claims asserted under the CLRA via certified mail, return receipt requested, in compliance with all of the CLRA's requirements.

COMPLAINT – JURY TRIAL DEMANDED

150.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business.

151.    Defendant acted with knowledge and intent.

152.    As alleged above, Defendant engaged in conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

153.    With respect to the CLRA claim, Plaintiff alleges in the alternative that they lack an adequate remedy at law for the reasons already alleged above in connection with the UCL claim.

154.    As a result of Defendant's misconduct, Plaintiff and members of the classes have suffered monetary harm.

155.    Plaintiff seeks all relief available under this cause of action.

## COUNT III

### Unjust Enrichment

156.    Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

157.    Plaintiff brings this cause of action individually and on behalf of all proposed Classes.

158.    To the extent required, Plaintiff asserts this cause of action in the alternative to legal claims, as permitted by Rule 8.

159.    Plaintiff and the Class Members conferred a benefit on Cake in the form of the gross revenues Cake derived from the money they paid to Cake.

160.    Cake knew of the benefit conferred on it by Plaintiff and the Class Members.

161.    Cake has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Cake omitted that the Products contain greater than 0.3% delta-9 THC

---

COMPLAINT – JURY TRIAL DEMANDED

and are illegal to purchase, possess, and use. This caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts concerning the Products had been known.

162.   Cake accepted and retained the benefit in the amount of the gross revenues derived from sales of the Products to Plaintiff and Class Members.

163.   Cake has thereby profited by retaining the benefit under circumstances which would make it unjust for Cake to retain the benefit.

164.   Plaintiff and Class Members are, therefore, entitled to restitution in the form of the revenues derived from Cake's sale of the Products.

165.   As a direct and proximate result of Cake's actions, Plaintiff and the Class Members have suffered in an amount to be proven at trial.

166.   Putative Class Members have suffered an injury in fact and have lost money as a result of Cake's unjust conduct.

167.   Putative Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Cake obtained as a result of its unjust conduct.

**COUNT IV**

**Fraud by Omission / Intentional Misrepresentation**

168.   Plaintiff realleges and incorporates the above allegations by reference as if set forth fully herein.

169.   Plaintiff brings this cause of action individually and on behalf of all other Class Members.

170.   This claim is based on fraudulent omissions and intentional misrepresentations concerning the molecular makeup of the Products and the fact that they contain greater than 0.3% delta-9 THC and are illegal to purchase, possess, and use. As discussed above, Defendants failed to disclose: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3%

delta-9 THC; (c) that the Products are not legal to purchase, possess, or use under federal law, and many state laws; and (d) that the Products are a Schedule I drug due to the delta-9 THC content. Further, Defendants intentionally misrepresented: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are legal to purchase, possess, or use under federal law, and many state laws; and (d) that the Products are not a Schedule 1 drug due to the delta-9 THC content.

171.   The false and misleading omissions and misrepresentations were made with knowledge of their falsehood. Defendants knew the true nature of the Products and their legal status. Nonetheless, Defendants continued to sell the Products using the false and misleading omissions and misrepresentations alleged herein to unsuspecting consumers.

172.   The false and misleading omissions and misrepresentations were made by Defendants, upon which Plaintiff and Class Members reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class Members to purchase the Products.

173.   The fraudulent actions of Defendants caused injury to Plaintiff and Class Members, who are entitled to damages and punitive damages.

174.   Plaintiff seeks all relief available under this cause of action.

<u>COUNT V</u>

**Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**

**Fla. Stat. §§ 501.201, *et seq.***

175.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

176.   Plaintiff brings this cause of action, in the alternative, individually and on behalf of the two Florida subclasses.

177.   Section 501.204(1) of the FDUTPA declares that "unfair or deceptive

COMPLAINT – JURY TRIAL DEMANDED

acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

178.    "Trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Section 501.203(8).

179.    The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce." *See* Section 501.202.

180.    Cake's conduct as described herein is in violation of Section 501.204(1) of the FDUTPA in that Cake engaged in unfair and deceptive acts and practices by advertising, soliciting, providing, offering, and distributing delta-8 vape products labeled as containing less than 0.3% delta-9 THC, when in fact that is false.

181.    Cake deceptively and misleadingly conceals and misrepresents material facts about the Products, including: (a) the true nature of the Products' ingredients; (b) that the Products contain greater than 0.3% delta-9 THC; (c) that the Products are not legal to purchase, possess, or use under federal law, and many state laws; (d) that the Products are marijuana and not hemp; and (e) that the Products are a Schedule I drug due to the delta-9 THC content.

182.    Plaintiff seeks all relief available under the FDUTPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, with equitable relief sought in the alternative to legal relief, as follows:

---

COMPLAINT – JURY TRIAL DEMANDED

a. For an order certifying the classes, naming Plaintiff as the representative of aforementioned classes (as applicable), and naming Plaintiff's counsel as Class Counsel for the certified classes;

b. For an order declaring Defendants' conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and the classes on all counts asserted herein;

d. For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiff and the classes their reasonable attorney fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a jury trial on all issues so triable.

Dated:  October 3, 2025   Respectfully submitted,

*/s/ Joel D. Smith*

**SMITH KRIVOSHEY, PLLC**
Joel D. Smith (SBN 244902)
Aleksandr "Sasha" Litvinov (SBN 95598)
(*pro hac vice* forthcoming)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail:  joel@skclassactions.com
              sasha@skclassactions.com

**SMITH KRIVOSHEY, PLLC**
Yeremey O. Krivoshey (SBN 295032)
Brittany S. Scott (SBN 327132)
28 Geary Street, Ste. 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com
              brittany@skclassactions.com

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN 249203)
Pamela Prescott (SBN 328243)
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Phone: 949-612-9999
E-Mail: ak@kazlg.com
              pamela@kazlg.com

*Attorneys for Plaintiff*

COMPLAINT – JURY TRIAL DEMANDED
38

## __CLRA Venue Declaration, Civil Code § 1780(c)__

I, Joel D. Smith, declare as follows:

1.     I have personal knowledge of the facts stated herein and, if called upon to do so, could competently testify hereto.

2.     I am the attorney for Plaintiff in the above-captioned action.

3.     I submit this declaration in support of the Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code § 1750 *et seq.*

4.     The Class Action Complaint has been filed in the proper place for trial of this action.

5.     It is my understanding that Defendants regularly transact business in Orange County, and the acts and omissions giving rise to this action occurred in large part in Orange County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on October 3, 2025 in Killingly, CT.


By:   /s/ Joel D. Smith

Joel D. Smith

COMPLAINT – JURY TRIAL DEMANDED

39